

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-24-2002

# USA v. Kushner

Precedential or Non-Precedential: Precedential

Docket No. 01-3549

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Kushner" (2002). *2002 Decisions.* Paper 600.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/600

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3549

UNITED STATES OF AMERICA,

v.

RAYMOND KUSHNER,

Appellant.

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 99-221)
District Judge: Hon. Robert J. Cindrich

Argued May 2, 2002

BEFORE: ROTH and STAPLETON, Circuit Judges,
and POLLAK,* District Judge

Filed September 24, 2002

James H. Love (Argued)
Bonnie R. Schlueter
Office of United States Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA 15219
Attorneys for the Appellees

_____

* Honorable Louis H. Pollak, District Judge for the United States District
Court for the Eastern District of Pennsylvania, sitting by designation.


Stephen F. Capone (Argued)
Stephen F. Capone & Associates
210 Grant Street, Suite 300
Pittsburgh, PA 15219
Attorney for the Appellant

OPINION OF THE COURT

POLLAK, District Judge.

On December 20, 1999, Raymond Kushner ("Kushner")
pled guilty to bank fraud, in violation of 18 U.S.C.S 1344(1),1
and conspiracy to commit bank fraud, in violation of 18
U.S.C. S 371. He appeals the District Court's calculation of
his sentence under the 1998 Sentencing Guidelines ("the
Guidelines"), and its determination that it lacked discretion
to depart downwards from that calculation. We affirm in
part and reverse in part.

I

In his guilty plea, Kushner admitted to having participated in a conspiracy to "produce" 2 and cash counterfeit checks between March 28, 1998 and roughly July 20, 1998. Donald Jones, a co-conspirator, "produce[d]" the checks. Kushner's role was to recruit individuals who agreed to be listed as payees on the checks and to provide their names to Jones. Kushner delivered preprinted counterfeit checks to the individuals he recruited, and then accompanied those individuals when they cashed the checks. He would take 90% of the cash, leaving them 10%. Kushner also presented two counterfeit checks for payment

---

1. 18 U.S.C. S 1344(1) provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--(1) to defraud a financial institution .. . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

2. The indictment alleged that Donald Jones, a co-conspirator of Kushner's, "would and did produce counterfeited checks purporting to be actual checks for various amounts issued."

2

in his own name. In total, the members of the conspiracy negotiated $38,452.95 worth of checks in this manner.

Late in the course of the conspiracy, Kushner learned that federal agents were investigating the scheme, and that they had arrested one or more of his co-conspirators. Before a warrant was issued for his own arrest, Kushner surrendered to the Secret Service and admitted his wrongdoing. He also handed over 219 preprinted checks, with a face value of $455,102.29, which had not yet been presented for payment.

At sentencing, the District Court applied the 1998 Sentencing Guidelines. Kushner's base offense level was 6, pursuant to S 2F1.1(a). Subpart (b)(1) of that section increases the base offense level by an amount dependent on the amount of monetary loss. The presentence investigation report ("PSIR") prepared by the probation office reported that the conspiracy had produced a total of 274 counterfeit checks, with a total face value of $498,300.64, but that only $38,452.95 worth of checks had actually been deposited. The PSIR stated that the monetary loss should be measured, for sentencing purposes, by the amount of loss Kushner intended to cause, and that the amount of loss he intended to cause should in turn be measured by the face value ($498,300.64) of the checks. Under S 2F1.1(b)(1)(J), his offense level should therefore be increased nine levels. Kushner objected, arguing that, for purposes of S 2F1.1, the amount of loss should be the value of the checks actually cashed rather than the total face

value of all the checks. He pointed out that, at the time of his surrender, he did not intend to deposit any of the uncashed checks, and that it would be unfair to penalize him for turning them over to the government.

The District Court ruled that the proper loss figure was the one suggested by the PSIR and endorsed by the government--$498,300.64. The District Court therefore applied S 2F1.1(b)(1)(J) to adjust Kushner's base offense level upwards by nine levels. Kushner's total offense level, including other adjustments, was seventeen; when combined with Kushner's criminal history, that figure yielded a sentencing range of 27 to 33 months of incarceration. Kushner requested a downward departure

3

pursuant to Application Note 11 of U.S.S.G. S 2F1.1, contending that the District Court's calculation of the intended loss overrepresented the seriousness of his crime. The District Court denied that motion and sentenced Kushner to 27 months of incarceration.

II

On appeal, Kushner challenges the District Court's calculation of the amount of loss caused by his activities and its refusal to grant him a downward departure. We give plenary review to the District Court's interpretation and application of U.S.S.G. S 2F1.1 and we review loss calculations and other factual conclusions for clear error. See United States v. Titchell, 261 F.3d 348, 353 (3d Cir. 2001).

A

Kushner's first contention on appeal is that the trial court erred in its application of S 2F1.1(b) of the Guidelines. Kushner contends that his withdrawal from the conspiracy made it improper to include, in the S 2F1.1 loss calculation, the face value of the unused counterfeit checks that he surrendered to authorities. Put another way, he contends that when he surrendered he did not "intend" to cause any loss greater than the $38,452.95 he had already caused. The District Court recognized that the timing of the intent inquiry was crucial: at some point during the conspiracy Kushner did intend to cash the full value of the checks, but he also changed his mind at a later time. However, relying upon "the history of the law of intent and attempt and abandonment," the District Court held that the intended loss should be measured by Kushner's intent at the time the conspiracy was still proceeding.

As an initial matter, we note that, in its application of S 2F1.1, the District Court was correct to focus its inquiry on the loss intended by the conspiracy. Application Note 8 to the 1998 version of U.S.S.G. S 2F1.1 states:

        Valuation of loss is discussed in the Commentary to

S2B1.1 (Larceny, Embezzlement, and Other Forms of

Theft). As in theft cases, loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred. Consistent with the provisions of S2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000 . . .

(emphasis added).

This court has examined the meaning of the phrase "intended loss" before. In United States v. Geevers, 226 F.3d 186 (3d Cir. 2000), we considered the appeal of Martin Geevers, who had pled guilty to conducting a check-kiting scheme. Geevers's scheme was to deposit checks from closed bank accounts or accounts with insufficient funds into new accounts he created, and then to withdraw the deposited money before the victim banks discovered the fraud. He contended that because he could not have successfully withdrawn all the fraudulently deposited funds even if he had wanted to, the District Court erred in concluding that his intended loss was represented by the face value of the checks he had deposited--a sum in excess of $2,000,000. On appeal, Chief Judge Becker, writing for the panel, agreed that "a district court errs when it simply equates potential loss with intended loss without deeper analysis." Id. at 192 (citing United States v. Kopp, 951 F.2d 521, 529 (3d Cir. 1991) (rejecting sentencing based on "worst-case scenario potential loss") (emphasis in original)). However, Chief Judge Becker also ruled that the sentencing court could reasonably have concluded that Geevers would have taken the full amount of the deposited checks if it were possible. The government's introduction of evidence regarding the face value of Geevers's deposits constituted a prima facie showing of that intent, and without a showing by Geevers that he intended to cause a smaller loss, the District Court was entitled to rely on the prima facie

showing. See also Titchell, 261 F.3d at 354 ("[T]he rule established by Geevers is that intended and potential loss may be the same (and a district court can draw an inference to that effect), but it is error for a district court simply to equate the two without 'deeper analysis.' ") (emphasis in original).

Geevers and Titchell touch on the problem here but do

not resolve it. The District Court did conduct a careful inquiry to determine the intended loss. The question before us is whether it correctly determined that Kushner "intended" to cause the loss associated with the uncashed counterfeit checks even though he voluntarily surrendered those checks to the government. Put another way, the question is when S 2F1.1 contemplates examination of Kushner's intentions--during the active course of the conspiracy or at his surrender. We hold that it is the former. Under the law of conspiracy, a defendant is liable for his own and his co-conspirators' acts for as long as the conspiracy continues unless he withdraws prior to the conspiracy's termination. See 1 Sarah N. Welling et al., Federal Criminal Law and Related Actions S 2.17 at 93-94 (1998). Withdrawal takes more than cessation of criminal activity. "The defendant must present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." United States v. Steele, 685 F.2d 793, 803-04 (3d Cir. 1982). But even upon withdrawal, a defendant remains liable for his previous agreement and for his own and his co-conspirators' previous acts in furtherance of the conspiracy--the crime is in the agreement, not in the achievement of its criminal end. See United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992) ("[O]nce an overt act has taken place to accomplish the unlawful objective of the agreement, the crime of conspiracy is complete and the defendant is liable despite his later withdrawal."); United States v. Read, 658 F.2d 1225, 1233 (7th Cir. 1981) ("Withdrawal becomes a complete defense only when coupled with the defense of the statute of limitations.").

In finding a defendant guilty based on his criminal intent during a conspiracy despite his later withdrawal, the

criminal law ignores a defendant's later change of heart. We conclude that the law of the guidelines does the same in calculating a defendant's "intended loss." Even when a defendant's intent changes as he withdraws from the conspiracy, the loss that should be considered for sentencing purposes remains the loss that the defendant intended during his active participation in the conspiracy. We therefore affirm the District Court's loss calculations under S 2F1.1(b)(1).

B

Kushner's second contention on appeal is that the District Court erred in ruling that it had no discretion to depart downwards pursuant to Application Note 11 of S 2F1.1. That note provides that "[i]n cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted," and lists six examples of such cases. The note then states:

> In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it. In such cases, a downward departure may be warranted.

At sentencing, Kushner contended that because he had himself surrendered the unnegotiated checks that were being used by the government to support an enhanced sentence, the "intended loss" they represented overstated the seriousness of his offense. The District Court disagreed, describing Kushner's argument as "circular." The District Court's position was that allowing a downward departure under Application Note 11 because Application Note 8 produced an unwarrantedly harsh sentence "is in effect to say I disagree with the Application Note 8, which I can't do." The District Court therefore found that, under S 2F1.1, it lacked the discretion to depart downwards where the proposed rationale for such downward departure was that Kushner's "intended loss" overrepresented the seriousness of his offense.

We believe that the District Court took an unnecessarily restricted view of Application Note 11. The language of that note indicates that there may be situations where the loss determined under subsection (b)(1) understates or overstates the seriousness of an offense. The fact that Application Note 8 clarifies that the "loss" referred to in subsection (b)(1) is the "intended loss," where that figure can be ascertained, does not limit the reach of Note 11; "intended loss" can understate or overstate the seriousness of an offense just as much as "actual loss." The example provided in the second part of Note 11 proves this point: only a very dull criminal could believe that an "obviously fraudulent" instrument will cause loss, and yet Note 11 contemplates that in such situations--that is, where the only measurable loss is an "intended loss"--the sentence mandated by the S 2F1.1(b)(1) loss calculation may be adjusted downwards.

Application Note 11 stands on an equal footing with Application Note 8; neither one restricts the meaning of the other. We therefore conclude that when Note 8 informs a district court's calculation under S 2F1.1(b)(1), Note 11 allows the court to depart from that calculation if it finds that the calculation overstates or understates the seriousness of the offense. See United States v. Coffman, 94 F.3d 330, 336-37 (7th Cir. 1996) ("[T]he place for mitigation on the basis of a large discrepancy between intended and probable loss is, under the guidelines, in the decision whether to depart downward, rather than in the calculation of the intended loss."). In this case, the District Court, concluding that it lacked discretion to consider the issue, never reached the factual question posed by Application

Note 11. We conclude that the District Court did have discretion to consider the issue. Accordingly, we will vacate Kushner's sentence and remand for resentencing in accordance with this opinion.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

8