# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Gillenwater v. Honeywell International, Inc.**, 2013 IL App (4th) 120929

---

| | |
|---|---|
| Appellate Court Caption | CHARLES GILLENWATER and DONITA GILLENWATER, Plaintiffs-Appellants, v. HONEYWELL INTERNATIONAL, INC.; PNEUMO ABEX, LLC; and OWENS-ILLINOIS, INC., Defendants-Appellees, and JOHN CRANE, INC., Defendant. |
| District & No. | Fourth District<br>Docket No. 4-12-0929 |
| Filed | September 18, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an asbestos action on behalf of plaintiff and his wife, the trial court's grant of three defendants' motions for judgment *n.o.v.* as to plaintiff and the entry of summary judgment for the three defendants as to plaintiff's wife were affirmed, since the evidence so overwhelmingly favored defendants with regard to plaintiff that no verdict against them could ever stand, and as to plaintiff's wife, defendants owed her no duty, because she was not married to plaintiff when he was exposed to the defendants' asbestos products. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 10-L-117; the Hon. Scott Drazewski, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

James Wylder and Andrew J. Kelly, both of Wylder Corwin Kelly LLP, of Bloomington, and J. Timothy Eaton (argued) and Patricia S. Spratt, both of Shefsky & Froelich, Ltd., of Chicago, for appellants.

Craig H. Zimmerman, Steven H. Hoeft, Colleen E. Baime (argued), and Michael W. Weaver, all of McDermott Will & Emery LLP, of Chicago, and Luke J. Mangan, of Polsinelli Shughart, P.C., of St. Louis, Missouri, for appellee Honeywell International, Inc.

Robert H. Riley, Matthew J. Fischer (argued), Neil Lloyd, and Joshua D. Lee, all of Schiff Hardin LLP, of Chicago, for appellee Owens-Illinois, Inc.

Craig L. Unrath, of Heyl, Royster, Voelker & Allen, and Robert W. Scott, of Swain, Hartshorn & Scott, both of Peoria, and Reagan W. Simpson (argued), of Yetter Coleman LLP, of Austin, Texas, and Amy Eikel, of King & Spalding, of Houston, Texas, for appellee Pneumo Abex, LLC.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Knecht and Turner concurred in the judgment and opinion.

## OPINION

¶ 1      One of the plaintiffs in this case, Charles Gillenwater, suffers from mesothelioma, which he contracted by inhaling airborne fibers from an asbestos-containing product. He brought this personal-injury action against defendants, Honeywell International, Inc. (Honeywell); Owens-Illinois, Inc. (Owens-Illinois); and Pneumo Abex, LLC (Abex), all manufacturers of asbestos-containing products. He sought compensation from them on the theory that they had been in a civil conspiracy with one another to conceal the respiratory dangers of asbestos. (He also sued a manufacturer of asbestos-containing gaskets, John Crane, Inc. (Crane), and won a verdict against that company. Crane, however, is not a party to this appeal. A separate appeal by Crane has been settled and dismissed.) Charles Gillenwater's alternate theory–alternate to the theory that the three defendants conspired together–was that Owens-Illinois entered into the same conspiracy with a nonparty, Owens-Corning Fiberglas Corporation (Owens-Corning), the manufacturer of Kaylo, an asbestos-containing insulation to which he also was exposed during his career as a pipefitter.

¶ 2      The other plaintiff in this case, Donita Gillenwater, is Charles Gillenwater's wife. She

alleged a loss of consortium as a result of her husband's contracting mesothelioma.

¶ 3　　The trial court entered summary judgment in defendants' favor on Donita Gillenwater's claims of loss of consortium. The case then went to trial on the remaining claims, and the jury returned a verdict in Charles Gillenwater's favor and against the three defendants. The jury awarded him compensatory damages in the amount of $9.6 million and also awarded him punitive damages in the amounts of $20 million against Honeywell, $40 million against Owens-Illinois, and $20 million against Abex.

¶ 4　　Honeywell, Owens-Illinois, Abex, and Crane filed motions for judgment notwithstanding the verdict, and the trial court granted the motions by Honeywell, Owens-Illinois, and Abex but denied the motion by Crane. The court entered judgment in Charles Gillenwater's favor and against Crane in the amount of $8,425,000.

¶ 5　　Charles Gillenwater appeals from the trial court's decision to grant the motions by Honeywell, Owens-Illinois, and Abex for judgment notwithstanding the verdict. Donita Gillenwater appeals from the summary judgment in favor of Honeywell, Owens-Illinois, and Abex on her claims of loss of consortium.

¶ 6　　Looking at all the evidence in the light most favorable to Charles Gillenwater and drawing all reasonable inferences in his favor, we conclude that the evidence so overwhelmingly favors defendants that no verdict against them could ever stand. As for Donita Gillenwater's claims of loss of consortium, defendants were entitled to summary judgment because they owed her no duty, given that she was not yet married to Charles Gillenwater at the time he was exposed to asbestos-containing products. Therefore, we affirm the trial court's judgment.

¶ 7　　　　　　　　　　　　I. BACKGROUND

¶ 8　　　　　　A. Evidence of Charles Gillenwater's Exposure to Kaylo

¶ 9　　Charles Gillenwater, who was 58 at the time of the trial, became a pipefitter in 1972 and continued in that profession until his retirement in 2007 or 2008. His apprenticeship lasted from 1972 to 1977, and during that period he and another apprentice pipefitter, Bill Tay, worked on many jobs together: Bridgestone/Firestone, for instance, and Moulton, Manchester, and Hewett Halls at Illinois State University. There were hundreds of feet of pipe in these places.

¶ 10　　Tay testified that, typically, as he and Gillenwater installed new pipes to carry steam or hot water, they used gaskets manufactured by Crane. These gaskets contained asbestos. Also, insulators employed by a contractor named Sprinkmann would be right behind Tay and Gillenwater, covering the pipes with a chalky white insulation that gave off clouds of dust when the insulators sawed it into pieces. In his testimony, Gillenwater likewise recalled the chalky, dusty white insulation, the fragments of which everyone, including the pipefitters, helped pick up during cleanup. According to Tay, the insulation "normally" was "an Owens-Corning brand," and Sprinkmann brought this insulation to the various jobsites where he and Gillenwater worked.

¶ 11　　Sprinkmann was a thermal insulation contractor, and Ellis Carlton testified he worked

for Sprinkmann from 1958 to 1994. By the early 1960s, Carlton was promoted to a position in which he was responsible for ordering all the materials for Sprinkmann.

¶ 12    According to Carlton, the two types of pipe covering that Sprinkmann used the most in the 1970s were Kaylo, sold by Owens-Corning, and Thermobestos, sold by Johns-Manville Corporation (Johns-Manville). Both were a "white chalky fibrous" insulation, "very dusty," that would "discolor your clothes" if "you brushed up against it." He testified that in the 1960s and early 1970s both Kaylo and Thermobestos contained asbestos, although Sprinkmann also carried insulation for cold-water pipes that was asbestos-free. It was not until 1976 or 1977 that Sprinkmann eliminated all asbestos-containing products from its warehouse.

¶ 13    Carlton testified that whenever representatives of Johns-Manville and Owens-Corning contacted him for the purpose of selling insulation to Sprinkmann, they never mentioned to him that the insulation was hazardous.

¶ 14    Likewise, Gillenwater testified that at no time during his apprenticeship was he informed that the insulation Sprinkmann installed on hot-water pipes at the jobsites where he worked contained asbestos. It was not until the 1980s that he even learned of the dangers of asbestos.

¶ 15    According to Tay, "nobody had a clue" that the insulation contained asbestos. And until the late 1980s or early 1990s, he, too, was unaware that asbestos was harmful.

¶ 16    At trial, it was undisputed that Gillenwater's mesothelioma had resulted from his inhalation of airborne fibers of asbestos.


¶ 17              B. Circumstantial Evidence Offered To Prove a Conspiracy

¶ 18    For some three days in the jury trial, plaintiffs presented evidence that, for several decades, from the early 20th century onward, the three defendants (Owens-Illinois, Honeywell, and Abex) knew asbestos was dangerous to breathe and that, despite such knowledge, they continued making asbestos-containing products without adequately protecting their employees from asbestos dust and they continued concealing the dangers of asbestos from their employees and the public. We need not specifically recount all that evidence. Suffice it to say, the record contains evidence that all three defendants had been contemporaneously committing one or more of the same types of wrongdoing: inadequately protecting their employees from asbestos dust, keeping quiet about the dangers of asbestos or affirmatively concealing or downplaying the dangers, and continuing to use asbestos in their products, without any adequate warning, even after the human cost had become evident.

¶ 19    But was there any evidence that the three defendants intentionally "planned, assisted[,] or encouraged" Owens-Corning's wrongdoing against Charles Gillenwater, *i.e.*, its selling to Sprinkmann, without adequate warning, asbestos-containing Kaylo insulation, the dust of which Gillenwater inhaled at jobsites while it was being installed? *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994); see also *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999) ("Civil conspiracy is an intentional tort ***.").

¶ 20    It is difficult to see how two of the defendants, Honeywell and Abex, could be found to have intentionally assisted or encouraged Owens-Corning in its own wrongdoing against

Gillenwater, considering that, in the statement of facts in their brief, plaintiffs do not mention that Honeywell and Abex ever interacted with Owens-Corning in any way. Honeywell and Abex appear to be nothing but bystanders, committing wrongs that had nothing to do with Gillenwater.

¶21 Plaintiffs describe, however, some interaction or ties between Owens-Illinois and Owens-Corning from the 1930s to the 1950s.

¶22 1. *Persons Serving as Directors on the Boards*
*of Both Owens-Illinois and Owens-Corning*

¶23 From 1938 to 1948, Owens-Illinois and Owens-Corning had some of the same directors. The number of directors they had in common varied. Some years it was as few as two directors, and other years it was as many as four directors. Some of these common directors were executive officers of one company or the other.

¶24 One of the exhibits that plaintiffs cite in their brief, plaintiffs' exhibit No. 710A, states as follows:

"Owens-Illinois and Owens-Corning had common directors between 1938, when Owens-Corning was formed, and 1948. For five of the years that Owens-Illinois and OF [(Owens-Corning Fiberglas)] had common directors, Owens-Illinois had no asbestos business. Beginning in 1943 and until 1948, Owens-Illinois manufactured only small quantities of asbestos products strictly on an experimental basis. Owens-Illinois started commercial production of Kaylo in 1948, the last year of common directors."

¶25 In 1948, Owens-Illinois and Owens-Corning had two directors in common: Harold Boeschenstein, who was the president of Owens-Corning, and William E. Levis, who was the chairman of the board at Owens-Illinois. The record does not appear to reveal the total number of directors each company had on its board.

¶26 2. *"Weapons in Reserve"*

¶27 In the early 1940s, employees of Owens-Corning complained that fiberglass was irritating their skin, and because of this discomfort, they demanded more pay. As "weapons in reserve" to use in negotiations with its employees, Owens-Corning obtained medical articles from Owens-Illinois showing that the alternative to fiberglass, asbestos, could be deadly for factory workers to breathe. As it turned out, Owens-Corning continued manufacturing fiberglass insulation without ever having to present this talking point to its employees.

¶28 3. *The Saranac Study of Kaylo and Owens-Illinois's Reaction to the Study*

¶29 a. Owens-Illinois Hires Saranac Laboratory
To Study the Respiratory Effects of Kaylo Dust

¶30 On February 12, 1943, U.E. Bowes, the director of research at Owens-Illinois, wrote to an experimental pathologist, L.U. Gardner of Saranac Laboratory at Saranac Lake, New York, asking him to perform a study. Bowes told Gardner that Owens-Illinois currently had

"in the pilot plant stage" a new type of thermal insulation, "a hydrous calcium silicate," that, when removed from a mold and dried, formed "a porous mass [that could] be sawed like lumber." Bowes was referring to Kaylo. He enclosed samples of Kaylo dust from the "pilot plant" and requested Gardner to determine whether the dust was an "air hazard."

¶ 31 Bowes wrote: "[The respiratory safety of Kaylo dust] should be considered from the standpoint of employees working in the plant where the material is made or where it may be sawed to desired dimensions, and also considered from the standpoint of applicators or erectors at the point of use."

¶ 32 **b. Gardner's Early Expression of Concern to Bowes**

¶ 33 On March 12, 1943, Gardner wrote to Bowes, thanking him for "further information on the composition of [his] synthetic insulating material."

¶ 34 Then Gardner remarked:

"I am disappointed to hear that what we thought to be synthetic asbestos proved to be chrysotile [asbestos] which had been added as a reinforcing agent.

The fact that you are starting with a mixture of quartz and asbestos would certainly suggest that you have all the ingredients for a first class hazard. However, the particle size of the former will, of course be determined.

The asbestos may or may not be in such form as to be inhalable."

¶ 35 Gardner then provided an estimate of how much the necessary tests and animal experiments would cost.

¶ 36 **c. Gardner's Successor, Vorwald, Informs Bowes That**

**Prolonged Exposure to Kaylo Dust Causes Asbestosis in Guinea Pigs**

¶ 37 On November 16, 1948, Gardner's successor at Saranac Laboratory, Arthur J. Vorwald, wrote to Bowes to give him an update on the Kaylo dust experiments. Enclosed with his letter was an interim report.

¶ 38 The experiments had been proceeding for some 36 months, and in his letter Vorwald summarized the results. As stated in a previous interim report that the laboratory had sent to Owens-Illinois, animals exposed to Kaylo dust for 30 months showed no adverse effects. It now emerged, though, that after being exposed to Kaylo dust for *more* than 30 months, the animals showed signs of asbestosis. Vorwald wrote:

"[T]he experimental study of the effects of inhaled Kaylo dust on normal uninfected animals is now finished and conclusions expressed on that subject are final rather than tentative.

In the report issued one year ago, which describes the findings in animals that inhaled Kaylo dust for periods up to 30 months, the following tentative conclusion was made:

'In consequence of the experimental studies with guinea pigs to determine the biological activity of Kaylo, it may be tentatively concluded that Kaylo alone fails to produce significant pulmonary damage when inhaled into the lung.'

During the 30 to 36 months [*sic*] period, however, definite indication of tissue reaction appeared in the lungs of animals inhaling Kaylo dust and therefore, I regret to say, our tentative conclusion quoted above must be altered. In all animals sacrificed after more than 30 months of exposure to Kaylo dust unmistakable evidence of asbestosis has developed, showing that Kaylo on inhalation is capable of producing asbestosis and must be regarded as a potentially-hazardous material."

¶ 39　In the concluding paragraph of his letter, Vorwald wrote:

"I realize that our findings regarding Kaylo are less favorable than anticipated. However, since Kaylo is capable of producing asbestosis, it is better to discover it now in animals than later in industrial workers. Thus the company, being forewarned, will be in a better position to institute adequate control measures for safeguarding exposed employees and protecting its own interests."

¶ 40　　　　　　d. Vorwald's Cover Letter to the Final Report

¶ 41　As we said, the November 1948 report was an interim report. On February 7, 1952, Vorwald sent W.G. Hazard of the Industrial Relations Division of Owens-Illinois the final report.

¶ 42　Vorwald wrote in his cover letter to the final report:

"The results of the investigations with animals show that Kaylo dust is capable of producing a peribronchiolar fibrosis typical of asbestosis. The dust also has a slightly unfavorable influence upon a tuberculosis infection. Although extrapolation from animal to human experience is difficult, nevertheless the results of the study indicate that every precaution should be taken to protect workers against inhaling the dust. Therefore, control measures should be directed to reducing the amount of atmospheric dust, especially at those points of operation where dust is generated."

¶ 43　　　　　　　　e. The Final Report

¶ 44　The final report from Saranac Laboratory, dated January 30, 1952, and enclosed with Vorwald's letter of February 7, 1952, was entitled "Investigation Concerning the Capacity of Kaylo Dust To Injure the Lung."

¶ 45　In its introduction, the report stated:

"Before Kaylo was used commercially on a large scale, it was important to determine whether or not any dust liberated from this product during manufacture, handling or fabrication would be likely to constitute a respiratory hazard to exposed individuals. Therefore, a comprehensive investigation was undertaken in which the effect of inhaled Kaylo dust on animals was studied. The investigation was started in February 1945 and was carried on for more than five years."

¶ 46　In another section, the report described this lengthy "inhalation experiment." About 450 animals–guinea pigs, rats, and hamsters–were confined in "a cubical dust room, 8 feet in dimension." For eight hours a day, five days a week, and for four hours on Saturdays, a Kaylo dust cloud was maintained in this cubical room by rotating a paddle in a hopper. "The

room was operated for more than five years, from February 1945 to June 1950," and "some [animals] lived in the dust room for as long as 3 years." At regular intervals during the experiment, some animals were dissected, and their lung tissues were "examined grossly and microscopically to determine the nature and extent of the dust reaction."

¶ 47 After discussing the negative findings from the initial 30-month period and the subsequent positive findings after more than 30 months of exposure, the report concluded: "Kaylo dust, when inhaled for a prolonged period is capable of producing in the lungs of guinea pigs, but not of rats, the peribronchiolar fibrosis typical of asbestosis."

¶ 48                                    f. Hazard's Deposition

¶ 49 In 1981, W.G. Hazard's deposition was taken in a previous case, separate from this one. In his deposition, he testified he retired from Owens-Illinois in 1974 and that, during his employment with Owens-Illinois as an industrial hygienist, the company had dust-collecting machinery in its Kaylo plants, it took air samples in the plants, and workers wore respirators.

¶ 50 So, Owens-Illinois took some measures to protect its factory workers–but no measures, it would appear, to protect users or consumers outside the factory, such as construction workers. Even though Kaylo was 15% asbestos, Hazard never visited any construction sites to see how much dust was generated during the installation of Kaylo, and he never participated in any discussion regarding the advisability of putting a warning label on packages of Kaylo.

¶ 51 An attorney for Owens-Illinois, Andrew Berry, asked Hazard in his deposition:

"Q. *** Why didn't Owens-Illinois put a warning on [Kaylo]?

A. The product was safe and the dust from the product was safe.

Q. And on what do you base that opinion?

A. Early in the days when Kaylo was being made, we worked with Saranac Laboratory for them to conduct animal inhalation experiments at Saranac Lake. Dust was gathered from a dust arrestor at the Berlin Plant and was sent to Saranac where they dispersed it in a room which was lined with animal cages and where the animals breathed the dust. This dust being Kaylo dust.

They followed the animals for a matter of weeks and weeks. The daily exposure was eight hours a day, five and a half days a week, week after week. Then at intervals when they assumed from their experience that the animals might have been affected by breathing the dust, they sacrificed groups of animals.

The first two experiments, first two series of experiments, were negative. The dust had no affect [*sic*] on the animals. The third series of experiments showed that the animals had contracted pulmonary asbestosis which was quite surprising, really, and at first somewhat of a concern.

However, it was concluded after succeeding experiments that there was no danger to the user of regular commercial Kaylo. The reason for this, the reasons were two. First, the exposure to the dust that the animals had was very, very high in actual figures in the order of 105, 110, 115 million particles, million asbestos fibers per cubic foot of air. The

threshold limit value for man is only 5 million fibers per cubic foot of air. So the cloud was extraordinarily dense and the reason for this was to speed up the effect on the animals. As it is, each series ran for two or three years, but they gave them big doses in order to speed up the effect.

Now, the second aspect was that the animals breathe dust five and half days a week, eight hours a day, week after week during their lifetime. No man ever breathes Kaylo dust for his lifetime. It would be impossible.

So, because of these two factors: One, the immense concentration that the animals were exposed to; and second, the fact that they were exposed for their lifetime made it unnecessary to label the product with some cautionary label.

In addition to this, it was published in the '40's a paper by Drinker and, what's his name, I forgot, it will come to me, published in the Journal of the American Industrial Hygiene Association where they examined shipyard insulation workers, men who installed pipe insulation on shipboard. They concluded that the occupation of insulation insulators [*sic*] was a safe one. The exposures that these men had were comparable, not the same, but comparable to what we had in our own manufacturing plant. We concluded that people handling Kaylo were also in a safe environment.

There were other things that were important in making this decision. The Kaylo plants at Berlin and Sayreville, New Jersey, had no Workmen's Compensation claims for any disease caused by breathing dust even after a good many years. They had no increased sick absenteeism in any way related to asbestos or Kaylo dust. The industrial hygiene people and doctors from the State of New Jersey Health Department found the insurance carrier, Workmen's Compensation insurance carrier from the Health Foundation, from Saranac Laboratory itself, and tests that we made at Owens-Illinois, showed that the dust exposure at Sayreville and Berlin was within safe limits, particularly as regards asbestos dust. So the conclusion was that this product was not harmful, hence, no reason to put a warning label on the carton."

¶ 52      4. *Owens-Corning's Distribution of Kaylo Manufactured By Owens-Illinois,*
              *Followed By Owens-Corning's Purchase of the Kaylo Division*

¶ 53      In 1943, Owens-Illinois began operating the pilot plant to manufacture Kaylo.

¶ 54      In 1948, Owens-Illinois began commercial production of Kaylo.

¶ 55      In 1953, Owens-Illinois and Owens-Corning entered into a distributorship agreement. Under this agreement, Owens-Illinois would continue manufacturing Kaylo, and Owens-Corning would market Kaylo.

¶ 56      Owens-Illinois sold its Kaylo division to Owens-Corning in 1958. Thereafter, Owens-Illinois had nothing more to do with Kaylo.

¶ 57      During the period of the distributorship agreement, 1953 to 1958, neither company placed any warnings on the Kaylo packaging.

¶ 58                                    5. *Advertisements of Kaylo*

¶ 59        Plaintiffs write in their brief:

> "There were numerous other exhibits admitted that were the same exhibits, perhaps with different numbers, that had been admitted in the *McClure* trial against Owens[-Illinois] and Owens-Corning. As one example, Owens[-Illinois] and Owens-Corning made statements in advertisements in the 1950s claiming Kaylo was 'non-toxic' during the time when Owens-Corning was distributing the product and Owens[-Illinois] was the manufacturer. Vol. 106, PX 33."

Plaintiffs inform us that, in the jury trial in this case, they presented all the exhibits that were presented in *McClure v. Owens Corning Fiberglas Corp.*, 298 Ill. App. 3d 591 (1998), *rev'd*, 188 Ill. 2d 102 (1999); *Burgess v. Abex Corp.*, 305 Ill. App. 3d 859 (1999), *vacated*, 311 Ill. App. 3d 900 (2000); *Dukes v. Pneumo Abex Corp.*, 386 Ill. App. 3d 425 (2008); *Rodarmel v. Pneumo Abex, L.L.C.*, 2011 IL App (4th) 100463; and *Menssen v. Pneumo Abex Corp.*, 2012 IL App (4th) 100904. To keep their statement of facts to a reasonable length, plaintiffs request that "the discussion of those exhibits by this Court [be] incorporated [into their brief] by reference."

¶ 60        *McClure* contains two references to "nontoxic" advertisements: "[I]n 1952, Owens-Illinois issued an advertising brochure in which it represented that Kaylo was nontoxic." *McClure*, 188 Ill. 2d at 117-18. Likewise, in 1956, Owens-Corning published a brochure advertising Kaylo as "nontoxic." *Id.* at 125. Plaintiff's exhibit No. 33, which plaintiffs cite in their brief, appears to be the 1956 brochure by Owens-Corning. The brochure says that Kaylo is manufactured by Owens-Illinois and distributed by Owens-Corning. "Under the distribution agreement, Owens Corning was required to use Owens-Illinois' trademark and trade name." *Id.*

¶ 61              6. *Owens-Illinois's Ownership of Owens-Corning Shares in 1959*

¶ 62        Owens-Illinois has owned shares in Owens-Corning. In 1959, those shares were worth $110 million. It is unclear how many such shares Owens-Illinois owned in other years.

¶ 63                  7. *Dollar Amounts of Kaylo That Owens-Corning Sold*

¶ 64        According to plaintiffs' exhibit No. 705, Owens-Corning's annual sales of Kaylo were as follows:

> $2,849,000 in 1953
> $3,798,000 in 1954
> $3,868,000 in 1955
> $5,637,000 in 1956
> $5,558,000 in 1957
> $6,732,000 in 1958
> $5,990,000 in 1959
> $7,167,000 in 1960

$6,812,000 in 1961

$7,062,000 in 1962

$7,864,000 in 1963

$7,859,000 in 1964

$9,138,000 in 1965

$9,193,000 in 1966

$10,054,000 in 1967

$9,683,000 in 1968

$9,045,000 in 1969

$8,844,000 in 1970

$8,436,000 in 1971

$9,430,000 in 1972

$4,715,000 in 1973.

¶ 65    As we said, from 1958 onward, Owens-Illinois was out of the Kaylo business, having sold the Kaylo division that year to Owens-Corning. Thus, Kaylo was strictly an Owens-Corning product from 1958 onward.

¶ 66                                8. *Warning Labels*

¶ 67    In 1964, when Johns-Manville announced it would begin putting a vague warning label on its asbestos-containing products, Owens-Corning considered putting a warning label on its own product, Kaylo. We quote from *McClure*, 188 Ill. 2d at 125-26:

"Plaintiffs' evidence of contacts between Owens Corning and Johns-Manville included a 1964 internal Owens Corning memorandum. This memorandum indicated that Johns-Manville's medical director had informed Owens Corning that, in October of that year, Johns-Manville planned to label shipping cartons of asbestos-containing products with warnings of the 'alleged hazards of asbestos.' The author of the Owens Corning memorandum observed:

'It is obvious that these warning labels will have some impact in the field and possibly upon Public Health and other government officials.

The question before us is whether or not Fiberglas Kaylo should protect itself against more stringent and punitive health laws and the possibility of third party actions by following the J-M lead.'

A 1965 internal Owens Corning memorandum indicated that, several months after receiving this information from Johns-Manville, Owens Corning was still deciding whether to place warning labels on its own asbestos-containing products. The author of the 1965 memorandum recommended that Owens Corning 'continue to give serious consideration to the labeling of *** Kaylo products in a manner similar to that currently being used by Johns-Manville *** [because] the fact that Johns-Manville is labeling their preformed products is in itself a pressure on the whole industry to consider labeling.' "

¶ 68    There was evidence that Owens-Corning began putting a warning label on Kaylo in 1966, but the warning label did not specifically identify the diseases that asbestos caused. *Id.* at 143. Carlton testified, on the other hand, that Owens-Corning never informed him of any danger from Kaylo.

¶ 69                                    II. ANALYSIS

¶ 70                        A. The Active Wrongdoer, Owens-Corning

¶ 71    If A, by some act or omission, tortiously breaches a duty that A owes to B and if this duty-breaching conduct is a proximate cause of harm to B, A is liable to B. See *Jones v. DHR Cambridge Homes, Inc.*, 381 Ill. App. 3d 18, 29 (2008); 34 Ill. L. and Prac. *Torts* §§ 1-5 (2010). Further, if C, D, and E "planned, assisted[,] or encouraged" A's wrongdoing against B, those three likewise are liable to B. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994). This is because C, D, and E were in a civil conspiracy with A. If C, D, and E planned, assisted, or encouraged A's breach of duty against B, then A, C, D, and E effectively had an agreement–a conspiratorial agreement–contemplating A's breach of duty to B (or A's breach of duty to victims such as B). A claim of conspiracy seeks to hold the encouragers liable for the wrongful act just as the doer of the act is liable. "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted[,] or encouraged the wrongdoer's acts." *Id.*

¶ 72    Because a conspiracy requires a conspiratorial agreement between the active wrongdoer and the other conspirators, a logical first step when evaluating a claim of conspiracy is to clearly identify the active wrongdoer, the one whose tortious conduct was a proximate cause of harm to the plaintiff, as distinct from those who harmed the plaintiff more indirectly, merely by encouraging the active wrongdoer. See *id.* at 63 ("[T]he gist of a conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement."). It is important to identify the active wrongdoer, because a conspiracy exists only if the others intentionally assisted or encouraged the tortious conduct of the active wrongdoer. See *McClure*, 188 Ill. 2d at 133-34.

¶ 73    In the present case, the only candidate for the designation of active wrongdoer is Owens-Corning. (As plaintiffs' counsel reminded us during oral arguments, the complaint named Crane as a defendant but not as a coconspirator. Hence, Crane is not a candidate for the designation of active wrongdoer for purposes of a conspiracy claim.) Kaylo, manufactured exclusively by Owens-Corning from 1958 onward, is the only brand of insulation positively identified as being present at jobsites where Charles Gillenwater worked as an apprentice pipefitter in the early 1970s. The positive identification was in Tay's testimony: according to him, the insulation which Sprinkmann brought to jobsites and which insulators installed on the steam lines was "a chalky white insulation[ ] and normally it would be an Owens-Corning brand." Also, Sprinkmann's former employee in charge of ordering materials, Carlton, testified that in the early 1970s Sprinkmann had Owens-Corning insulation, Kaylo, in its warehouse and that this chalky, dusty insulation, which Owens-Corning always supplied to Sprinkmann without any warning, contained asbestos.

¶ 74    Granted, Sprinkmann also carried brands of insulation that were asbestos-free, but

apparently this was insulation other than Kaylo, judging by Carlton's testimony. Carlton testified that the inventory in Sprinkmann's warehouse included the chalky white insulation manufactured by Owens-Corning under the brand name "Kaylo" and that in the early 1970s this particular brand of insulation contained asbestos. Sprinkmann filled orders out of its warehouse and did not eliminate asbestos from its warehouse until 1976 or 1977.

¶ 75    It is true that, according to Carlton's testimony, Sprinkmann also carried Johns-Manville's insulation, Thermobestos, which likewise was chalky and white and contained asbestos. Carlton was unable to say, however, which brands of insulation went to particular jobsites, and the record appears to contain no evidence that Johns-Manville insulation, in particular, was used at any of the jobsites where Gillenwater worked, let alone that he was exposed to Johns-Manville insulation with any frequency. See *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 364 (1992) ("[I]n order for the plaintiff to prevail on the causation issue there must be some evidence that the defendant's asbestos was put to 'frequent' use in the Bloomington facility in 'proximity' to where the decedent 'regularly' worked."). It would be speculation to say that any Johns-Manville insulation whatsoever was used at jobsites where Gillenwater worked. Because tort liability cannot be predicated on speculation, surmise, or conjecture (*Schultz v. Hennessy Industries, Inc.*, 222 Ill. App. 3d 532, 540 (1991)), Johns-Manville does not qualify as an active wrongdoer.

¶ 76    Defendants (Owens-Illinois, Honeywell, and Abex) are not active wrongdoers, either, because the record appears to contain no evidence that any of *their* products were a proximate cause of harm to Gillenwater. In order for defendants to be active wrongdoers for purposes of a civil conspiracy, Gillenwater had to be harmed by a defect in their products. See Restatement (Third) of Torts: Products Liability § 1 (1998); Restatement (Second) of Torts § 388 (1965) (applied in *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 348-49 (1996)). We are aware of no evidence that such was the case. Defendants had no duty to warn anyone of the dangers of asbestos in the abstract, wherever it might be found; their duty was to warn of the dangers of their particular asbestos-containing products (see *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 265 (1990); Restatement (Second) of Torts § 388 (1965))–as well as to refrain, of course, from encouraging others to tortiously breach their duties. The only duty to Gillenwater that defendants allegedly breached was a duty to refrain from encouraging others, such as Owens-Corning, to breach their duty to him. See *Adcock*, 164 Ill. 2d at 62. Plaintiffs seek to hold defendants liable solely on the theory that the active wrongdoer's concealment of the dangers of its own asbestos-containing product was at the encouragement of defendants or, in other words, was pursuant to an agreement that the active wrongdoer had with defendants. See *McClure*, 188 Ill. 2d at 133.

¶ 77    The only active wrongdoer in this case is Owens-Corning. Looking at the evidence in the light most favorable to plaintiffs and resolving all reasonable inferences in their favor (see *id.* at 132; *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)), we accept as true Carlton's testimony that Owens-Corning never warned him of the dangers of Kaylo during the period when Owens-Corning supplied that product to Sprinkmann. Section 388 of the Restatement (Second) of Torts provides:

> "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the

-13-

consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." Restatement (Second) of Torts § 388 (1965).

¶ 78    Owens-Corning supplied Sprinkmann a chattel to use, namely, Kaylo. See Restatement (Second) of Torts § 388 cmt. c (1965) (for purposes of this section, the term "suppliers" includes sellers). Looking at the evidence in the light most favorable to plaintiffs (see *McClure*, 188 Ill. 2d at 132), one could reasonably infer that Charles Gillenwater came into frequent contact with Kaylo (see *Thacker*, 151 Ill. 2d at 364), since Tay testified that the chalky white insulation used at the various jobsites where he and Gillenwater worked "normally *** would be an Owens-Corning brand" and that it was installed on hundreds of feet of pipe. Evidently, Sprinkmann's employees used Kaylo in the manner for which Owens-Corning had supplied it: cutting it into sections and installing the sections on pipes as insulation. Because Kaylo was chalky, dusty, and fibrous, it was reasonably foreseeable to Owens-Corning that clouds of asbestos dust would be produced when Sprinkmann's employees cut the Kaylo into sections at the jobsite. It likewise was reasonably foreseeable to Owens-Corning that pipefitters would be at the jobsite, near this insulation work, and that they would "be endangered by [this] probable use" of Kaylo in that they would inhale the airborne asbestos fibers. Restatement (Second) of Torts § 388 (1965); see also *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 520 (1987). Owens-Corning knew that asbestos could over time injure the lungs, because in the early 1940s, when Owens-Corning's employees complained that fiberglass was making their skin itch, Owens-Corning obtained medical articles from Owens-Illinois–"weapons in reserve"–to show that asbestos was an undesirable alternative to fiberglass because asbestos was potentially deadly to breathe. Even so, a few years later, Owens-Corning began selling Kaylo. Because Kaylo was widely used–for instance, Owens-Corning sold $9,430,000 of it in 1972–Owens-Corning knew, or reasonably should have known, that the dangers of Kaylo were not widely known. Consumers surely would not have been so avid to buy the chalky, fibrous insulation if they knew it scarred the lungs of whomever breathed its dust, in addition to causing mesothelioma, and that troublesome dust-control measures would be necessary whenever the insulation was sawed into usable pieces–if the insulation could be safely used at all. (Owens-Illinois notes in its brief: "In 1960, Dr. Richard Wagner published his research, demonstrating an association between asbestos exposure and mesothelioma.") According to Carlton, Owens-Corning never warned Sprinkmann of any hazard whatsoever. And in any event, the vague warning labels that Owens-Corning began affixing to Kaylo in 1966 said nothing about asbestosis or cancer. See *Hammond v. North American Asbestos Corp.*, 105 Ill. App. 3d 1033, 1037 (1982) ("If unaccompanied by sufficient warnings, a product that

-14-

contains inherent dangers is defective when it is sold and therefore unreasonably dangerous."). Hence, Owens-Corning is an active wrongdoer against Charles Gillenwater under section 388 of the Restatement (Second) of Torts.

¶ 79    Just as we must be clear on who the active wrongdoer is–Owens-Corning–we must be clear on the precise nature of Owens-Corning's wrongdoing, because we are looking for clear and convincing evidence that any of the defendants encouraged Owens-Corning to commit that wrongdoing. See *Adcock*, 164 Ill. 2d at 62. In their brief, plaintiffs speak of a conspiracy to "conceal the hazards of asbestos exposure," but to be precise, it is not a wrong, it is not a tort, merely to conceal the hazards of asbestos exposure. Again, a manufacturer owes no duty to warn of the dangers of asbestos in the abstract; rather, a manufacturer owes a duty to warn of the dangers of its own products that have been released into the stream of commerce. *Smith*, 137 Ill. 2d at 265; Restatement (Second) of Torts § 388 (1965). Thus, Owens-Corning's wrongdoing was *supplying a defective product*. See Restatement (Third) of Torts: Products Liability § 1 (1998); Restatement (Second) of Torts § 388 (1965). A product is defective if, when sold, it is unreasonably dangerous because it lacks an adequate warning of its inherent dangers. *Hammond*, 105 Ill. App. 3d at 1037.

¶ 80    B. The Evidence Plaintiffs Offered To Prove, Circumstantially, That Owens-Corning Was in a Conspiracy With Defendants

¶ 81    Now that we have identified the active wrongdoer, Owens-Corning, as well as its wrongdoing toward Charles Gillenwater, we ask whether there is any evidence that the three defendants–Owens-Illinois, Honeywell, and Abex–"planned, assisted[,] or encouraged" Owens-Corning's distribution of Kaylo without an adequate warning of its inherent danger. *Adcock*, 164 Ill. 2d at 62. We can set aside the question of whether the three defendants were in a conspiracy amongst themselves, that is, whether they helped or encouraged one another to distribute their own asbestos-containing products without an adequate warning. *Cf. McClure*, 188 Ill. 2d at 150 ("Proof of a relationship between *defendants themselves* does not establish the required [conspiratorial] agreement with *Unarco or Johns-Manville*." (Emphases in original.)). The question, for purposes of the present case, is whether they encouraged the active wrongdoer, Owens-Corning, to distribute Kaylo without an adequate warning. See *Adcock*, 164 Ill. 2d at 62. Plaintiffs concede they have no direct evidence that defendants did so. But plaintiffs insist they presented enough circumstantial evidence.

¶ 82    If the circumstantial evidence were merely that Owens-Corning observed the three defendants distributing their own asbestos-containing products without any warning and that Owens-Corning thereafter, on its own initiative, decided to follow their example, a conspiracy was as a matter of law unproved. Circumstantial, as opposed to direct, evidence of a conspiracy must be clear and convincing (*McClure*, 188 Ill. 2d at 134), and although "consciously parallel behavior" (*id.* at 135) is valid circumstantial evidence of a conspiracy, it is not, by itself, clear and convincing evidence of a conspiracy (*id.* at 142). The reason is that consciously parallel behavior is susceptible to a nonconspiratorial explanation that is at least as reasonable as a conspiratorial explanation: Owens-Corning saw defendants distributing their own asbestos-containing products without a warning label, and Owens-

Corning, on it own, without any advice or encouragement from them, decided to follow their example–because Owens-Corning, like them, wanted to make money. See *id.* at 140 ("Like these other courts, we find that requiring more than proof of mere parallel conduct in civil conspiracy cases involving manufacturers of the same or similar products is necessary to make certain that there is a reasonable basis for inferring an agreement and to minimize the risk that liability will be imposed based on nonconspiratorial conduct."); *Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 78 (2005) (that the defendants followed Jewel's lead in the pricing of milk does not necessarily mean they all were in an agreement to fix prices; rather the defendants could have been "acting competitively in an oligopolistic market").

¶ 83    In the statement of facts in plaintiffs' brief, we see no evidence that Honeywell or Abex ever interacted with Owens-Corning in any way, let alone that they "planned, assisted, or encouraged" Owens-Corning's marketing of Kaylo without a warning label. *McClure*, 188 2d at 133.

¶ 84    We see evidence, however, of some interaction or ties between Owens-Corning and Owens-Illinois. Does this evidence reasonably tend to exclude the possibility that Owens-Corning and Owens-Illinois were acting independently in their parallel conduct of releasing Kaylo into the marketplace without any warning of asbestosis? See *id.* at 136. The evidence appears to show that (1) some persons–two at the fewest and four at the most–served on the boards of both Owens-Illinois and Owens-Corning during the period of 1938 to 1948; (2) Owens-Illinois owned stock in Owens-Corning in 1959; and (3) Owens-Illinois and Owens-Corning had a distributorship agreement from 1953 to 1958, whereby Owens-Illinois manufactured Kaylo and Owens-Corning sold or marketed it.

¶ 85                              1. *The Shared Directors*

¶ 86    The shared directors do not count as a valid " 'plus' factor," a factor over and above parallel conduct. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993); see *McClure*, 188 Ill. 2d at 135-36 (citing *Petruzzi's IGA* and other federal antitrust cases). That Owens-Illinois and Owens-Corning had some of the same directors on their boards from 1938 to 1948 does not "reasonably tend[ ] to exclude the possibility that" Owens-Illinois and Owens-Corning "were acting independently" in their parallel conduct of selling Kaylo without a warning label from 1953 to 1958, the years of the distributorship (assuming the 1950s are even relevant to Charles Gillenwater's exposure to Kaylo in the 1970s). *Id.* at 136. Owens-Corning was not yet in the asbestos business, and as of yet had nothing to do with Kaylo, from 1938 to 1948, the only years when Owens-Illinois and Owens-Corning had some of the same directors. In fact, in the 1940s, Owens-Corning was prepared to argue to its employees that asbestos was deadly and therefore not a desirable alternative to fiberglass in the manufacture of insulation.

¶ 87           2. *Owens-Illinois's Ownership of Stock in Owens-Corning in 1959*

¶ 88    As for Owens-Illinois's ownership of $110 million of stock in Owens-Corning in 1959, that fact sheds no light on what relationship, if any, the two companies had with each other in the 1970s, when Gillenwater was exposed to Kaylo.

-16-

¶ 89    3. *The Distributorship Agreement*

¶ 90    From 1953 to 1958, Owens-Illinois and Owens-Corning had a distributorship agreement whereby Owens-Illinois manufactured Kaylo and Owens-Corning distributed it. By 1952, the year before these two companies entered into the distributorship agreement, Saranac Laboratory had discovered that prolonged exposure to Kaylo dust caused asbestosis in the lungs of guinea pigs. Even earlier, in the 1940s, Owens-Corning borrowed articles from Owens-Illinois suggesting that breathing asbestos could be harmful to factory workers.

¶ 91    Nevertheless, in the 1950s, no warning label appeared on Kaylo packaging, and Owens-Illinois and Owens-Corning each published advertisements representing Kaylo to be "non-toxic."

¶ 92    In his deposition, Hazard offered an explanation for the lack of a warning on Kaylo packaging: no actual user of Kaylo would have had an experience comparable to that of the guinea pigs in the dusting room at Saranac Laboratory; no actual user of Kaylo would have breathed such a thick cloud of Kaylo dust continuously, 5 hours a day, 5 days a week, and 4 hours on Saturdays, for 31 to 36 months. Realistically, the exposure for humans would not have been so intensive or extreme.

¶ 93    And yet, despite the difficulty of extrapolating from the guinea pigs to humans, a medical doctor, Vorwald, presumably an expert in such matters, thought that Kaylo dust posed a risk to people–and not merely to workers in Kaylo factories but also to construction workers outside the factories. Owens-Illinois had requested Saranac Laboratory to study the question not only from the standpoint of factory workers but also "from the standpoint of applicators or erectors at the point of use." After conducting the animal experiments, Vorwald recommended that, "at those points of operation where [Kaylo] dust [was] generated"–which would include construction sites as well as Kaylo plants–dust-control measures be taken. Even if the guinea pigs had suffered a greater intensity of exposure than humans probably ever would have suffered, Vorwald concluded that "Kaylo on inhalation [was] capable of producing asbestosis and [had to] be regarded as a potentially hazardous material."

¶ 94    So, Vorwald acknowledged the ambiguity–"extrapolation from animal to human experience [was] difficult"–nevertheless, he recommended resolving the ambiguity in favor of safety by assuming that Kaylo dust was harmful for people to breathe.

¶ 95    Owens-Illinois, by contrast, chose to allow users and consumers to bear the risk of that ambiguity, by not putting any warning label on Kaylo. And as we have said, as early as the 1940s, Owens-Corning was of the opinion that breathing the dust of asbestos-containing insulation was potentially deadly, because Owens-Corning was prepared to make that argument to its employees when they were complaining of skin irritation from fiberglass. Therefore, when we look at the evidence in the light most favorable to plaintiffs and resolve reasonable inferences in their favor (see *McClure*, 188 Ill. 2d at 132), we can envision a finding that selling Kaylo without a warning label specifically pointing out the risk of asbestosis was a tortious act.

¶ 96    Was there clear and convincing evidence that Owens-Illinois encouraged Owens-Corning to sell Kaylo without any warning, such that these two companies could be considered

coconspirators? During the period of the distributorship agreement, 1953 to 1958, both companies knew that Kaylo dust was potentially a respiratory hazard, that it might scar the lungs of people who breathed it. Few consumers would have chosen Kaylo after being informed that dust control measures would have to be taken wherever it was installed, to guard against the risk of asbestosis. When we look at the evidence in the light most favorable to plaintiffs, the distributorship agreement implied an understanding between Owens-Illinois and Owens-Corning that the potential danger of Owens-Illinois's product would be concealed or not disclosed when the product was distributed. Otherwise, the distributorship agreement would have been pointless; as a practical matter, Kaylo would have been unmarketable if its risk were disclosed. Given what these two companies knew about the respiratory threat posed by asbestos, Owens-Illinois's encouragement of Owens-Corning, via the distributorship agreement, to sell Owens-Illinois's product, Kaylo, amounted to encouragement to keep quiet about the danger of Kaylo–because such silence was essential to the marketing and selling of Kaylo.

¶ 97    How long, though, does such a conspiracy last? The distributorship agreement ended with Owens-Illinois's sale of its Kaylo division to Owens-Corning in 1958. Charles Gillenwater's earliest exposure to Kaylo, in 1972, was some 14 years after Owens-Illinois sold its Kaylo division. Could the jury reasonably have found Owens-Illinois to still be in the conspiracy as late as 1972? We have not found any Illinois case that is on point. Therefore, we have looked for guidance outside Illinois.

¶ 98                                a. The Scope of the Conspiracy

¶ 99    As we have discussed, when we apply the *Pedrick* standard, a rational trier of fact could find, by clear and convincing circumstantial evidence, that during the period of the distributorship agreement, 1953 to 1958, Owens-Illinois encouraged Owens-Corning to distribute a defective product, *i.e.*, Kaylo, without an adequate warning label. But what about after 1958? Recall that, after 1958, Owens-Illinois no longer was in the Kaylo business and Owens-Corning was the sole manufacturer and distributor of Kaylo. Because of Owens-Illinois's continued silence about the danger of Kaylo after 1958, did the conspiracy between the two companies stay alive, with the result that, more than 14 years later, in 1972, Owens-Illinois was responsible for the active wrongdoing of Owens-Corning in distributing Kaylo to Sprinkmann without an adequate warning label?

¶ 100    The United States Supreme Court would appear to answer no. In criminal cases (which we assume to be relevant because a conspiracy is a conspiracy), the Supreme Court has held that once the object of the conspiracy has been accomplished, the prosecution cannot extend the life of the conspiracy by implying a subsidiary agreement to keep silent about the conspiracy. *Grunewald v. United States*, 353 U.S. 391, 405 (1957); *Lutwak v. United States*, 344 U.S. 604, 617-18 (1953); *Krulewitch v. United States*, 336 U.S. 440, 444 (1949).

¶ 101    In *Grunewald*, for example, the defendants were convicted of a conspiracy to defraud the United States in tax matters. *Grunewald*, 353 U.S. at 393. Two of the conspirators in that case were New York business firms, Patullo Modes and Gotham Beef Company, which the Bureau of Internal Revenue had been investigating for suspected tax evasion. A lawyer, Max

Halperin, agreed to help these companies with their tax problems. He had an influential friend in Washington named Grunewald. *Id.* at 395. Halperin obtained money from Patullo and Gotham for bribes and passed the bribes on, through Grunewald, to an official in the Bureau of Internal Revenue named Bolich, who, in 1948 and 1949, obtained "no prosecution" rulings for Patullo and Gotham. *Id.*

¶ 102        In 1951, a committee of the House of Representatives began an investigation. *Id.* The conspirators became anxious and, in 1951 and 1952, took steps to hide any evidence of their conspiracy. Halperin attempted to dissuade Patullo and Gotham from revealing the conspiracy, and Grunewald asked his secretary not to talk to the grand jury. *Id.* at 396. These attempts at concealment proved futile, and the defendants' indictments and convictions followed.

¶ 103        The statutory period of limitation for this conspiracy offense was three years, and one of the questions in *Grunewald* was whether this statute of limitations barred the prosecution of the defendants. *Id.* The grand jury returned its indictment on October 25, 1954. Therefore, to satisfy the statute of limitations, the government had to "prove that the conspiracy, as contemplated in the agreement as finally formulated, was still in existence on October 25, 1951, and that at least one overt act in furtherance of the conspiracy was performed after that date." *Id.* In other words, the government had to prove that (1) the conspiracy still existed within three years before the return of the indictment and (2) at least one overt act in furtherance of the conspiratorial agreement was performed within that three-year period. *Id.* at 396-97. To determine whether (1) and (2) were proved, the Supreme Court had to examine "the scope of the conspiratorial agreement"–just as we must examine the scope of the conspiratorial agreement between Owens-Illinois and Owens-Corning–"for it [was] that which determine[d] both the duration of the conspiracy, and whether the act relied on as an overt act [could] properly be regarded as in furtherance of the conspiracy." *Id.* at 397.

¶ 104        The defendants argued that the object of their conspiracy–the scope of their conspiratorial agreement–was to obtain the "no prosecution" rulings for Patullo and Gotham. *Id.* The Bureau of Internal Revenue issued those rulings in 1948 and 1949, and therefore, the defendants concluded, the 1954 indictment was beyond the three-year period of limitation. *Id.* at 397-98.

¶ 105        The government made some counterarguments, and the one relevant for our purposes is this. The government argued that, even if the main object of the conspiracy was to obtain the "no prosecution" rulings, "the conspiracy also included as a subsidiary element an agreement to conceal the conspiracy to 'fix' these tax cases, to the end that the conspirators would escape detection and punishment for their crime." *Id.* at 398. In this view, the conspiracy was still ongoing, and overt acts in furtherance of the conspiracy were still being performed, during the three-year period preceding the indictment. It was in 1952, two years before the indictment, that Halperin tried to talk the taxpayers into not revealing the conspiracy and that Grunewald tried to talk his secretary into withholding information from the grand jury. *Id.* at 396.

¶ 106        The Supreme Court was unconvinced by the government's counterargument, because *every* conspiracy was, by its nature, secret. *Id.* at 402. No one entered into a conspiratorial

-19-

agreement on the understanding that, after the illicit fruits of the conspiracy had been harvested, the coconspirator would turn around and announce the conspiracy to the world. *Id.* "[E]very conspiracy will inevitably be followed by actions taken to cover the conspirators' traces." *Id.* To say the conspiracy continues as long as the conspirators conceal the conspiracy could extend the life of the conspiracy indefinitely. *Id.* Thus, the Supreme Court held: "[A]fter the central purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." *Id.* at 401-02.

¶ 107    In the present case, the central object of the conspiracy between Owens-Illinois and Owens-Corning was to sell Owens-Illinois's product, Kaylo, without an adequate warning of its inherent danger, *i.e.*, the danger that breathing Kaylo dust could cause asbestosis. That object was accomplished in 1958, at the end of the distributorship agreement, whereupon Owens-Illinois sold its Kaylo division to Owens-Corning. The record gives no basis for supposing that, after 1958, Owens-Illinois cared whether Owens-Corning sold any more Kaylo.

¶ 108    It is true that, presumably, Owens-Illinois did not want anyone to get the idea of suing it for the Kaylo that, prior to 1958, it manufactured and released into the stream of commerce without a warning label, and so Owens-Illinois no doubt preferred that Owens-Corning continue to keep quiet about the potential of Kaylo to cause asbestosis. But arguing that the conspiracy continued as long as the conspirators concealed their misdeeds predating 1958 would extend the life of the conspiracy to absurd lengths–for 14 years, for example. See *id.*

¶ 109                        b. Withdrawal From the Conspiracy

¶ 110    Courts have looked to a criminal antitrust case, *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978), for guidance on what qualifies as a withdrawal from a civil conspiracy. See, *e.g.*, *Drug Mart Pharmacy Corp. v. American Home Products Corp.*, 288 F. Supp. 2d 325, 329 (E.D.N.Y. 2003); *Pope v. Bond*, 641 F. Supp. 489, 496 (D.D.C. 1986). The Supreme Court said in *Gypsum*: "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *Gypsum*, 438 U.S. at 464-65.

¶ 111    The conspiracy between Owens-Illinois and Owens-Corning was for Owens-Corning to sell Owens-Illinois's product, Kaylo, by failing to disclose to users and consumers the potential danger of the product. By selling the Kaylo division to Owens-Corning in 1958, Owens-Illinois took an affirmative action inconsistent with the object of the conspiracy, in that henceforth it would be impossible for Owens-Corning (by culpable silence) to continue selling Kaylo manufactured by Owens-Illinois. See *id.* Obviously, Owens-Illinois communicated this affirmative act to Owens-Corning, considering that Owens-Corning was the buyer of the Kaylo division.

¶ 112    Just as Owens-Illinois's continued silence did not extend the life of the conspiracy once the central object of the conspiracy was accomplished, so Owens-Illinois's continued silence

(to users and consumers about the potential danger of Kaylo to cause asbestosis) did not prevent Owens-Illinois from withdrawing from the conspiracy by selling the Kaylo division to Owens-Corning. We reason by analogy from *United States v. Steele*, 685 F.2d 793 (3d Cir. 1982).

¶ 113    In *Steele*, the federal government charged officers of General Electric Company with bribing a Puerto Rican official to award General Electric a contract to construct a power plant. *Id.* at 797-98. Robert Naples was a high-level employee of General Electric (*id.* at 798), and in September 1973 he met with Hoyt Steele, a General Electric vice president and head of the international sales division (*id.* at 799). In this meeting, Naples suggested that General Electric hire a subcontractor, Twombly, Inc., to act as a conduit for the bribe, and Naples asked Steele to " 'approve a payment,' " *i.e.*, a bribe. *Id.*

¶ 114    General Electric was very secretive in the way it went about paying the Puerto Rican official: the bribe was concealed in "an elaborate subcontract package." *Id.* at 800. General Electric paid him in installments, in May, September, and December 1975 and in June 1976. *Id.* at 800-01.

¶ 115    Naples resigned from General Electric in August 1975, while General Electric was still paying the bribe in installments, ingeniously concealed in subcontracts. *Id.* at 803. Naples argued that his resignation from General Electric was, as a matter of law, a withdrawal from the conspiracy and that the statute of limitations therefore barred the indictment against him, returned more than five years after his resignation. *Id.*

¶ 116    The government argued, on the other hand, that by remaining silent after his resignation, Naples continued to participate in the conspiracy. *Id.* If, after resigning from General Electric, Naples had come clean and reported the conspiracy to authorities, the conspiracy–which he had helped to arrange–would have been thwarted. In the government's view, his silence after his resignation had sustained the conspiracy.

¶ 117    The Third Circuit rejected the government's argument. The Third Circuit said: "Because the government failed to produce evidence to rebut Naples' prima facie showing of withdrawal prior to the period of limitations, we hold that his convictions must be reversed on all counts." *Id.* By resigning from General Electric, Naples affirmatively communicated to his coconspirators that he no longer wished to participate in the conspiracy to bribe a Puerto Rican official to award General Electric the contract. Granted, Naples did not confess to the authorities; but confessing to authorities was only one way, not the exclusive way, of withdrawing from a conspiracy. "The defendant must present evidence of some affirmative act of withdrawal on his part, typically *either* a full confession to the authorities *or* communication to his co-conspirators that he has abandoned the enterprise and its goals." (Emphases added.) *Id.* at 803-04. By resigning, Naples performed an affirmative act signifying to his coconspirators that he no longer wished to participate in the conspiracy.

¶ 118    Similarly, by selling the Kaylo division to Owens-Corning in 1958 and walking away, Owens-Illinois signified to Owens-Corning that it no longer would participate in the conspiracy to distribute Kaylo without an adequate warning label. Owens-Illinois's continued silence did not change the fact of its withdrawal from the conspiracy.

¶ 119                c. A Manufacturer Owes No Duty To Warn of a Product

Similar to Its Own But Manufactured By Someone Else

¶ 120    The argument might be made that had Owens-Illinois warned of the respiratory danger of Kaylo dust while Owens-Illinois was still manufacturing Kaylo, Charles Gillenwater would not have breathed Kaylo dust in the early 1970s, when Owens-Corning was the succeeding manufacturer of Kaylo, because the danger of Kaylo dust would have been generally known decades earlier, in the 1950s. Thus, by this reasoning, Owens-Illinois ultimately caused Charles Gillenwater's mesothelioma by manufacturing and distributing Kaylo, without any warning label, in the 1950s.

¶ 121    Using this reasoning to impose liability on Owens-Illinois would violate a fundamental tenet of products-liability law: a manufacturer is responsible only for the defects in the products it manufactured. Owens-Illinois did not manufacture the Kaylo that gave Charles Gillenwater mesothelioma. "Regardless of the theory which liability is predicated upon, whether negligence, breach of warranty, strict liability in tort, or other grounds, it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold, or was in some way responsible for the product ***." Annotation, *Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged To Have Caused Injury*, 51 A.L.R.3d 1344, § 2(a) (1973). A manufacturer owes a duty to plaintiffs who will use its product or be injured by it, but the manufacturer does not owe a duty to anyone who uses a product similar to, but not manufactured by, the manufacturer. *Smith*, 137 Ill. 2d at 265; *Kirk*, 117 Ill. 2d at 520.

¶ 122    It would be unfair to impose liability on a manufacturer for a defect in a product unless the manufacturer had the opportunity to avoid liability by stopping the assembly line that produced that particular product. Upon selling the Kaylo division to Owens-Corning, Owens-Illinois lost its power to stop the assembly line. To make Owens-Illinois liable for the Kaylo that Owens-Corning continued to churn out would make Owens-Illinois an insurer of Owens-Corning. See *Smith*, 137 Ill. 2d at 266.

¶ 123    In sum, when we look at all the evidence in the light most favorable to plaintiffs and draw all *reasonable* inferences in their favor, the evidence so overwhelmingly favors defendants that no verdict against them could ever stand. See *McClure*, 188 Ill. 2d at 132. The reason is that, in an effort to prove, circumstantially, that defendants had "planned, assisted, or encouraged" Owens-Corning's wrongdoing against Gillenwater (*id.* at 133), plaintiffs adduced only evidence of parallel conduct, *i.e.*, evidence that Owens-Corning and defendants both had been concealing the dangers of their own asbestos-containing products, and plaintiffs did not adduce any valid plus factors, *i.e.*, "additional evidence that reasonably tend[ed] to exclude the possibility that" Owens-Corning and defendants "were acting independently" in their parallel conduct (*id.* at 136). "[P]arallel conduct may serve as circumstantial evidence of a civil conspiracy among manufacturers of the same or similar products but is insufficient proof, by itself, of the agreement element of this tort." *Id.* at 135. This is because if, as in the present case, the parallel conduct was to each company's economic advantage, the parallel conduct has an "innocent" explanation. *Id.* at 141. And in

this context, "innocent" does not mean innocent of all wrongdoing whatsoever but innocent of a particular kind of wrongdoing: a conspiracy. *Id.* at 136. The "innocent," or nonconspiratorial, explanation is quite simply this: each company did, unilaterally, whatever it had to do to continue making money, including distributing a defective product, a product unaccompanied by an adequate warning. See *id.* at 141 ("[B]asic economic principles dictate that competitive companies will often act in a highly similar manner." (Internal quotation marks omitted.)). One company did not have to tell another to continue making money. One company did not have to tell another on which side its bread was buttered.

¶ 124                          C. The Innocent-Explanation Rule

¶ 125      Plaintiffs complain that, before this court's decision in *Rodarmel*, the jury's verdict in their favor would have withstood a motion for judgment notwithstanding the verdict. They argue that *Rodarmel* changed the legal landscape, to the detriment of plaintiffs in asbestos litigation, and that, in so doing, *Rodarmel* "failed to consider directions given by our supreme court in *Thacker v. UNR Industries, Inc.*, and later reinforced in *McClure v. Owens-Corning*" regarding the standard of review applicable to motions for judgment notwithstanding the verdict.

¶ 126      Paradoxically, after criticizing *Rodarmel* for failing to follow *McClure*, plaintiffs turn around and criticize *McClure* for applying the innocent-explanation rule. The innocent-explanation rule was the very essence of *McClure*. *McClure* held that if a civil conspiracy were to be proved by circumstantial evidence as opposed to direct evidence, the circumstantial evidence had to be clear and convincing. *Id.* at 134. Further, *McClure* held: "Under this clear and convincing standard, 'if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved.' " *Id.* at 140-41 (quoting *Tribune Co. v. Thompson*, 342 Ill. 503, 529 (1930)). (And, again, in this context, "innocence" means being innocent of a conspiracy, not necessarily innocent of other wrongdoing, such as independently concealing the dangers of one's own asbestos-containing product. See *id.* at 140.)

¶ 127      According to plaintiffs, the supreme court's application of the innocent-explanation rule is misguided because that rule "should be confined to the facts in *Tribune Co.*, *i.e.*, cases involving public officials." Public officials are presumed to act honestly and in good faith in the discharge of their official duties, and the innocent-explanation rule, as plaintiffs understand it, is just another way of saying that a party alleging official corruption must overcome that presumption of honesty and good faith. See *Tribune Co.*, 342 Ill. at 529. In plaintiffs' view, the innocent-explanation rule should be regarded as inapplicable unless the defendant is a public official.

¶ 128      The short answer to this argument is we have no power to review decisions of the supreme court. (We understand, though, that plaintiffs' intent in making this argument could be to prevent a contention of forfeiture should this case reach the supreme court.) Without implying that we have such power, we would make the following observation in support of the supreme court's application of the innocent-explanation rule. If a fact finder could find clear and convincing evidence despite the possibility of an innocent explanation, just as the

fact finder could find a preponderance of the evidence despite the possibility of an innocent explanation (see *Mort v. Walter*, 98 Ill. 2d 391, 396 (1983)), there would be no real distinction between clear and convincing evidence and a preponderance of the evidence. Clear and convincing evidence is supposed to be a more demanding standard of proof, or to represent a "higher level of certainty," than a preponderance of the evidence. *In re Marriage of Bass*, 176 Ill. App. 3d 249, 252 (1988). If, however, for purposes of a motion for judgment notwithstanding the verdict, the jury were permitted to settle for the same level of certainty under a clear-and-convincing standard as it could under a preponderance-of-the-evidence standard in that the possibility of an innocent explanation would not matter, "clear and convincing evidence" would be an empty, *pro forma* phrase; in practice, there would be no difference between the two standards of proof. See *Rodarmel*, 2011 IL App (4th) 100463, ¶ 87 (explaining, by analogy to *Reed v. Northwestern Publishing Co.*, 124 Ill. 2d 495, 512 (1988), that "the ruling on a judgment notwithstanding the verdict *** implicates the applicable evidentiary standard of proof, such as proof by clear and convincing evidence"). If "clear and convincing evidence" is to have any meaning, no reasonable trier of fact could find, by clear and convincing evidence, that the defendants entered into a conspiratorial agreement if a nonconspiratorial explanation could reasonably be postulated.

¶ 129    Plaintiffs characterize the innocent-explanation rule as something in addition to, or over and above, clear and convincing evidence. On the contrary, the innocent-explanation rule is inherent in the standard of clear and convincing evidence. "*Under this clear and convincing standard*, if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved." (Emphasis added.) (Internal quotation marks omitted.) *McClure*, 188 Ill. 2d at 140-41. In other words, if a nonconspiratorial explanation would be reasonable, then all the evidence, viewed in the light most favorable to the plaintiff, so overwhelmingly favors the defendant that a contrary verdict based on that evidence could never stand (*id.* at 132)–simply because, as a matter of law and also as a matter of language, it is impossible to find *clear and convincing* evidence of a conspiracy if a nonconspiratorial explanation would be a reasonable alternative (*id.* at 140-41).

¶ 130                    D. Plaintiffs' Attempted Distinction
Between Parallel Conduct and "Individual Conduct"

¶ 131    As we have discussed, the supreme court held in *McClure* "that, while mere parallel conduct [might] serve as circumstantial evidence of an agreement under the civil conspiracy theory, it cannot, in itself, be considered clear and convincing evidence of such an agreement among manufacturers of the same or similar products." *McClure*, 188 Ill. 2d at 142. In their reply brief, plaintiffs try to get around that holding by characterizing parallel conduct as "individual conduct." For example, they characterize as individual conduct Owens-Illinois's failure to put any warning on Kaylo packages from 1943 to 1958 and Abex's attempt in 1975 to prevent inspectors of the Occupational Health and Safety Administration from mingling with union leaders during an inspection of an Abex plant. Plaintiffs appear to be suggesting that, unless various manufacturers behaved identically on a detailed level–unless more than

one manufacturer did exactly the same thing, right down to the specific facts–such incidents are individual conduct rather than parallel conduct and thus qualify as "additional evidence" over and above parallel conduct. *Id.* at 136.

¶ 132        We do not understand *McClure* as defining "parallel conduct" so narrowly. The supreme court said: "[W]e find that the jury could have found parallel action based on the evidence that, like Unarco or Johns-Manville, [the] defendants (1) knew that asbestos could cause disease at the time they sold asbestos-containing products; (2) sold these products without warning of these diseases; (3) failed to warn employees and consumers of these diseases; and (4) failed to adequately protect their employees from exposure to asbestos dust." *Id.* at 146. (And, by the way, that would be a fair statement of the parallel conduct in the present case.) Necessarily, those four propositions were manifested in factually different circumstances or in factually different ways in the case of each individual defendant in *McClure*. Nevertheless, even though the conduct of each defendant was factually different in its particulars, the conduct of the defendants was parallel in that it generally could be described by (1), (2), (3), or (4). *Id.*

¶ 133                      E. Plaintiffs' Contention That, Ever Since *Rodarmel*,
                          We Have Strayed From the *Pedrick* Standard

¶ 134        *Pedrick* holds that judgment notwithstanding the verdict should not be entered unless the evidence, when viewed in the light most favorable to the opponent, "so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Pedrick*, 37 Ill. 2d at 510. As a corollary to that holding, "[j]udgment notwithstanding the verdict is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." (Internal quotation marks omitted.) *McClure*, 188 Ill. 2d at 132.

¶ 135        Plaintiffs repeatedly assert, in the argument section of their brief, that *Rodarmel* and *Menssen* departed from the *Pedrick* standard by regarding the evidence in the light most favorable to the defendants instead of regarding the evidence in the light most favorable to the plaintiffs. But this repeated assertion does not convince us. It appears that the only specific example plaintiffs offer of our supposed departure from *Pedrick* is our statement, in *Rodarmel*, that, "in suppressing the cancer references [in the article published in the scientific journal], the sponsors [of the Saranac study] could have done the right thing for the wrong reason." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 124. (The "Saranac study," in this context, is a different study from the Kaylo dusting experiment. Saranac Laboratory performed several different experimental studies at the behest of manufacturers of asbestos-containing products.) But in that quoted passage, we drew the inference that the *plaintiffs* drew in their brief: we inferred, as the plaintiffs invited us to infer, that the sponsors had suppressed the cancer references not to protect the integrity of science but to save their own skins. *Id.* Nevertheless, despite this impure motivation, leaving the cancer references out of the published scientific article was the "right thing" to do, given what Dr. Gardner had told the sponsors in his letter to them (*id.* ¶ 31 (" 'As it will take two or three years to complete *** a study [of the relationship between asbestos and cancer in mice], I believe it would better be omitted from the present report.' ")). Presenting the tumors in the eight or nine mice

-25-

as evidence of a causal relationship between asbestos and cancer would have been faulty science, unfit for publication in a scientific journal. The National Cancer Institute (*id.* ¶¶ 39-42) and Dr. Pratt (*id.* ¶ 53) agreed that, for a variety of reasons, one could not honestly present those eight or nine mice as scientific evidence that asbestos caused cancer: there were no controls in the experiment (*id.* ¶ 41), some of the mice were genetically predisposed to develop cancer under normal conditions (*id.* ¶¶ 36, 41), the number of mice in the experiment was too small to be scientifically meaningful (*id.* ¶ 42), and it was unclear whether any of the tumors that Gardner found in the mice actually were cancerous (*id.* ¶¶ 49-53).

¶ 136     Whether withholding the cancer references from the scientific article was the "right thing" to do was a question of legal duty, not factual inference. We wrote:

"[I]n suppressing the cancer references, the sponsors could have done the right thing for the wrong reason. Even if the tumors in the mice scientifically proved nothing, publicizing them could have been prejudicial to Johns-Manville's business, or Johns-Manville could have had that fear. So, yes, it is an eminently reasonable inference that Johns-Manville, Abex, and other companies were concerned more about their own skin than about scientific integrity. The question, though, is not whether Abex's motives were pure. Instead, the question is whether Abex agreed 'to commit an unlawful act or a lawful act in an unlawful manner.' *Adcock*, 188 Ill. 2d at 64. As far as we can see, it was not against the law, and it was not tortious, for the financing corporations to conceal the occurrence of tumors in a small group of mice if (1) the tumors were not scientific evidence of a relationship between asbestos and cancer and (2) it was unclear that any of the tumors were in fact cancerous. Granted, from the vantage of hindsight, we now know it is a scientific fact that asbestos causes cancer in humans. But it does not necessarily follow that asbestos caused the tumors (benign or malignant) in the eight or nine mice at Saranac Laboratory, some of which were genetically prone to develop tumors under any conditions. Unless Abex had notice that the tumorous mice were scientific evidence that asbestos caused cancer, Abex did not enter into a conspiratorial agreement by agreeing to conceal information about the tumorous mice–because concealing the information was not an unlawful or tortious act. It cannot be unlawful to hide information that is devoid of significance: information that, as [Dr.] Murphy [of the National Cancer Institute] put it, was 'not of any tremendous value.' " *Id.* ¶ 124.

In their brief in the present appeal, plaintiffs do not explain how *Rodarmel* is mistaken in its evaluation of the sponsors' duty with respect to the cancer references. Or, if it was a matter of negligence rather than duty, plaintiffs do not explain how a rational trier of fact could find negligence in refraining from publishing as scientific evidence that which was not scientific evidence.

¶ 137          F. Plaintiffs' Concern That, After *Rodarmel*, It Will Be Impossible,
                            in Asbestos Litigation, To Prove a
                            Conspiracy By Circumstantial Evidence
                       and That Henceforth Only Direct Evidence Will Suffice

¶ 138     The supreme court has observed: "A conspiracy is almost never susceptible to direct

proof. [Citation.] Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." (Internal quotation marks omitted.) *McClure*, 188 Ill. 2d at 134. Plaintiffs say: "The danger from *Rodarmel* and *Menssen* is that it is becoming likely that the only evidence a court will accept as sufficient to establish a conspiratorial agreement, at least in asbestos cases, is *direct* evidence. *** Now it seems that, even though more and more evidence is offered in asbestos cases, *no amount* of circumstantial evidence will suffice." (Emphases in original.)

¶ 139    Perhaps, though, the problem is not so much with *Rodarmel* and *Menssen* as with the theory of a conspiracy. Here, basically, is the problem as we see it. In the jury trial, plaintiffs portrayed Owens-Corning and defendants as caring only about making money, even at the expense of people's lives. And maybe, historically, that portrayal is deserved. But, given that portrayal, why would one need to posit a conspiratorial agreement to explain these companies' continuing to do the wrongful things whereby they each were making a lot of money? They each, individually and independently, had a powerful economic incentive to conceal the hazards of their own asbestos-containing products. Consequently, it would seem that a conspiratorial agreement is a fifth wheel, which could be lopped off by Occam's razor.

¶ 140    In federal antitrust litigation, to which the supreme court drew an analogy in *McClure*, 188 Ill. 2d at 135-36, "[t]he absence of action contrary to one's economic interests renders consciously parallel business behavior 'meaningless, and in no way indicates [a conspiratorial] agreement.' " *Venzie Corp. v. United States Mineral Products Co.*, 521 F.3d 1309, 1314 (3d Cir. 1975) (quoting Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals To Deal*, 75 Harv. L. Rev. 655, 681 (1962)). This is because if the parallel conduct is to each of the companies' economic benefit, the hypothesis of a conspiracy is superfluous; the parallel conduct is explainable "on the hypothesis of independent individual decision, to their apparent individual self-interest." Turner, *supra* at 681. Thus, when a plaintiff undertakes to prove, circumstantially, a conspiracy in restraint of trade, evidence of parallel conduct is not enough; courts require "additional evidence that reasonably tends to exclude the possibility that the defendants were acting independently." *McClure*, 188 Ill. 2d at 136. "Such additional evidence includes evidence of '(1) actions contrary to the defendants' economic interests, and (2) a motivation to enter into such an agreement.' " *Id.* (quoting *Petruzzi's IGA*, 998 F.2d at 1242).

¶ 141    This is not to say it is *impossible* for companies to have a conspiratorial agreement to continue doing that which is in their economic interest. We merely observe that a conspiratorial agreement is *unnecessary* to explain their parallel conduct in continuing to do that which is in their economic interest. They each could be expected to pursue their economic interest on their own individual initiative. For that reason, in the absence of a plus factor, it would be speculation to posit a conspiracy on the basis of consciously parallel conduct that is in each company's economic interest; and tort liability cannot rest on speculation (*McClure*, 188 Ill. 2d at 152).

¶ 142    This eschewing of speculation does not mean that a conspiratorial agreement has to be express. The Restatement (Second) of Torts gives an example of a conspiratorial agreement that is tacit:

"A and B are driving automobiles on the public highway. A attempts to pass B. B speeds up his car to prevent A from passing. A continues in his attempt and the result is a race for a mile down the highway, with the two cars abreast and both travelling at dangerous speed. At the end of the mile, A's car collides with a car driven by C and C suffers harm. Both A and B are subject to liability to C." Restatement (Second) of Torts § 876 cmt. a, illustration 2 (1979).

A and B did not explicitly agree to breach their duty of care to other motorists, such as C; they did not explicitly agree to have a drag race. But their conspiratorial agreement is no less clear for being tacit. Their agreement is clear because it would be unreasonable, under the circumstances, to characterize as independent and self-initiated their parallel behavior in speeding down the highway; instead, the only reasonable inference is that B intentionally encouraged A and that A acted on B's encouragement: B sped up his car with the intent of challenging A, and A understood and accepted the challenge. See *Adcock*, 164 Ill. 2d at 62 ("The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts.").

¶ 143    Because the plaintiffs in *Rodarmel* and *Menssen* did not offer any evidence that the consciously parallel conduct of the defendants was contrary to the defendants' economic interests, they were obliged to present some other plus factor, some "additional evidence that reasonably tend[ed] to exclude the possibility that the defendants were acting independently": evidence of intentional encouragement. *McClure*, 188 Ill. 2d at 136. See *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) ("uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable [citations], or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision [citations]"); *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 322 (3d Cir. 2010) (one plus factor is "evidence implying a traditional conspiracy, *** which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown" (internal quotation marks omitted)). We reasoned, from *McClure*, that the additional evidence plaintiffs presented did not qualify as plus factors: it did not reasonably tend to exclude the possibility that the defendants were acting independently. *Menssen*, 2012 IL App (4th) 100904, ¶¶ 33, 51-52; *Rodarmel*, 2011 IL App (4th) 100463, ¶¶ 106-17. This was not a matter of drawing factual inferences in the defendants' favor; rather, this was a matter of following the logic of *McClure* and refraining from drawing speculative, and therefore unreasonable, inferences in the plaintiffs' favor.

¶ 144                    G. The Summary Judgment in Defendants' Favor on
                         Donita Gillenwater's Claims of Loss of Consortium

¶ 145    Donita Gillenwater appeals from the summary judgment in favor of Honeywell, Owens-Illinois, and Abex on her claims of loss of consortium. She argues the trial court erred by granting the summary judgment on the basis that defendants owed no duty to her. In their summary-judgment motions, defendants insisted to the trial court that because Donita Gillenwater was not yet married to Charles Gillenwater in the 1970s, when he was exposed

-28-

to asbestos, they owed her no duty under tort law.

¶ 146 Apart from this question of duty, the argument might be made that "where the impaired spouse's claim fails as a matter of law, the deprived spouse's claim for loss of consortium must likewise fail." *Brown v. Metzger*, 118 Ill. App. 3d 855, 858-59 (1983), *aff'd*, 104 Ill. 2d 30 (1984). Donita Gillenwater could object, however, that if defendants' motions for summary judgment against her had been denied and she had been allowed to participate in the jury trial and present evidence therein, Charles Gillenwater's own claim might not have failed as a matter of law. See *Monroe v. Trinity Hospital-Advocate*, 345 Ill. App. 3d 896, 899 (2004) ("Although a loss of consortium action is necessarily predicated on the claim of a directly injured spouse in that it arises from the same operative facts, it is legally separate and distinct from the directly injured spouse's cause of action.").

¶ 147 That objection would seem valid. Therefore, we will take the motions for summary judgment on their own terms, considering whether, in the 1970s, before plaintiffs were married, defendants owed Donita Gillenwater a duty to warn Charles Gillenwater of the dangers of asbestos.

¶ 148 We review summary judgments *de novo* (*Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 93 (2010)), just as we review judgments notwithstanding the verdict *de novo* (*Walton v. Dirkes*, 388 Ill. App. 3d 58, 60 (2009)). "Summary judgment is proper if, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Lazenby*, 236 Ill. 2d at 93 (citing 735 ILCS 5/2-1005(c) (West 2004)).

¶ 149 The material undisputed facts are that Charles Gillenwater was exposed to asbestos in the 1970s, he married Donita Gillenwater in 1987, and there is no evidence he was exposed to asbestos after marrying her. Under Illinois case law, most notably *Monroe*, those facts entitled defendants to judgment as a matter of law on Donita Gillenwater's claims of loss of consortium.

¶ 150 In *Monroe*, 345 Ill. App. 3d at 897, Alvin Monroe underwent surgery for priapism soon before his marriage to Kathy Monroe. After marrying her, he discovered that the surgery had disabled him from having an erection. *Id.* at 898. Kathy Monroe sued the hospital and the doctors for loss of consortium, and on the defendants' motion, the trial court dismissed her claims because she was not yet married to Alvin Monroe at the time of the allegedly negligent surgery. *Id.* The First District affirmed the dismissal, reasoning that, at the time of the surgery, when the alleged negligence occurred, the defendants could not have owed Kathy Monroe a duty to refrain from interfering with her marital relationship with Alvin Monroe, considering that she was not yet married to him at that time. *Id.* at 899.

¶ 151 We find *Monroe* to be well reasoned, and like the First District in *Monroe* (*id.* at 898-99), we are unconvinced by cases from other states holding that a plaintiff can have a cause of action for loss of consortium premised on a tortious act committed prior to the marriage if, under the discovery rule, the cause of action accrued after the marriage (see, *e.g.*, *Vanhooser v. Superior Court*, 142 Cal. Rptr. 230, 236 (Cal. Ct. App. 2012); *Owens-Illinois, Inc. v. Cook*, 872 A.2d 969, 984 (Md. 2005)). It is a fundamental principle of tort law that the

-29-

defendant incurs liability to the plaintiff only by breaching a duty that the defendant owes the plaintiff at the time of the wrongful act or omission. *Monroe*, 345 Ill. App. 3d at 899; *Sostock v. Reiss*, 92 Ill. App. 3d 200, 206 (1980). As to a particular plaintiff, a breach could not have occurred unless, at the time of the alleged breach, the defendant owed the plaintiff a duty that could be breached. When a manufacturer wrongfully exposes a pipefitter, without adequate warning, to an asbestos-containing product, the manufacturer owes no duty to the pipefitter's future spouse. By that exposure, the manufacturer does not breach a duty to the future spouse, because at that time, the manufacturer owes no duty to the future spouse. See *id.* Therefore, the trial court was correct to grant summary judgment in defendants' favor on Donita Gillenwater's claims of loss of consortium.

¶ 152                                    III. CONCLUSION

¶ 153          For the foregoing reasons, we affirm the trial court's judgment.

¶ 154          Affirmed.